UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEALTHY HARVEST BERRIES, INC., | Case No. 1:14-cv-0218 LJO SKO |
| Plaintiff, | ORDER ON PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION |
| v. | |
| RAFAEL RODRIGUEZ, et al., | |
| Defendants. | |

Now before the Court is Plaintiff Healthy Harvest Berries, Inc.'s ("Healthy Harvest Berries'") request for a preliminary injunction against Defendants Rafael Rodriguez ("Mr. Rodriguez") and his business entity Richgrove Produce ("Richgrove")[1] under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.* The Court has carefully reviewed the parties' submissions on this issue, and for the reasons set forth below GRANTS IN PART and DENIES IN PART Healthy Harvest Berries' request for a preliminary injunction.

I.  BACKGROUND

Healthy Harvest Berries asserts the following facts. Healthy Harvest Berries grows and sells strawberries in Royal Oaks, California. (Doc. 7, Decl. of Humberto Gonzales, ¶ 31.) In October 2012,

---

[1] Dandrea Produce, Inc. ("Dandrea") is also a defendant in this case but is not a subject of the request for preliminary injunctive relief.

Healthy Harvest Berries reached an agreement with Mr. Rodriguez to supply strawberries to Dandrea for sale under Dandrea's own label. (See id. at ¶¶ 18-20.) Under the arrangement, Mr. Rodriguez was to serve as the point of contact between Healthy Harvest Berries and Dandrea, and all invoices were to be sent to Mr. Rodriguez and Richgrove. (See id. ¶¶ 17, 20.)

Healthy Harvest Berries made its first shipment of strawberries to Dandrea in April 2013. (Id. ¶ 20.) Sometime in early August 2013, Healthy Harvest Berries discovered that Dandrea had not paid for shipments of strawberries made in June, July, and August 2013. (Id. ¶ 21.) The missing payments amounted to $516,038.90 in sales. (Id. ¶ 9.) When Healthy Harvest Berries questioned Dandrea about the overdue balance, Dandrea maintained that it had made the payments to Mr. Rodriguez. (Id. ¶ 23.) Mr. Rodriguez, in turn, claimed that he was unable to find the money and needed to check his records. (Id. ¶¶ 23-24.) Mr. Rodriguez then claimed that he was due a commission and would not forward any of the proceeds to Healthy Harvest Berries, despite Dandrea's assertion that the proceeds far exceeded any commission that could have been owed. (Id. ¶ 25.) Healthy Harvest Berries attempted to contact Mr. Rodriguez on multiple occasions thereafter in an effort to resolve the issue and collect the amount due, but Mr. Rodriguez did not return any of the calls. (Id. ¶ 26.)

Consequently, on February 19, 2014, Healthy Harvest Berries filed suit against Mr. Rodriguez, Richgrove, and Dandrea for, among other things, breach of contract and unjust enrichment. Healthy Harvest Berries also moved for a temporary restraining order against Mr. Rodriguez and Richgrove to prevent the dissipation of money owed to Healthy Harvest Berries. On February 20, 2014, the Court granted Healthy Harvest Berries' application for a temporary restraining order and ordered the parties to file briefing on the issue of whether a preliminary injunction should be issued. Mr. Rodriguez and Richgrove filed a timely response on February 28, 2014, and Healthy Harvest Berries filed a timely reply on March 4, 2014.

## II. LEGAL STANDARD

A court may grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010). A preliminary injunction, however, "is an extraordinary remedy never awarded

as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). The moving party must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. Id. at 20.

The Ninth Circuit follows a "sliding scale" approach to preliminary injunctions. See Alliance for The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a weaker showing as to the likelihood of success on the merits may be offset by a stronger showing with respect to the balance of the equities. Id. at 1131-32. For example, if the moving party is unable to establish a likelihood of success on the merits, preliminary injunctive relief may still be had if the party can show that (1) there are at least "serious questions" going to the merits; (2) the balance of the hardships tips "sharply" in its favor; and (3) the other factors listed in Winter (i.e., irreparable harm and in the public interest) are satisfied. Id. at 1135. "Serious questions" in the context of preliminary injunctive relief are those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." Republic of Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." Id. (citation and internal quotation marks omitted).

### III. DISCUSSION

#### A. Preliminary Injunction

##### 1. Likelihood of Success on the Merits

PACA was "designed in part to assure that farmers are paid for their produce." Perfectly Fresh Farms, Inc. v. United States Dep't of Agric., 692 F.3d 960, 962 (9th Cir. 2012). To this end, PACA provides a statutory trust "in which a produce dealer holds produce-related assets as a fiduciary until full payment is made to the produce seller." Bowlin & Son, Inc. v. San Joaquin Food Serv., Inc. (In re San Joaquin Food Serv., Inc.), 958 F.2d 938, 939 (9th Cir. 1992). See 7 U.S.C. § 499e(c). "The trust automatically arises in favor of a produce seller upon delivery of produce and is for the benefit of all unpaid suppliers or sellers involved in the transaction until full payment of the sums owing has been received." C&E Enters., Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.), 947 F.2d 1351, 1352

3

(9th Cir. 1991). The produce seller must then take certain steps to preserve the benefits of the PACA created trust. See 7 U.S.C. § 499e(c)(3)-(4).

Generally, to recover the proceeds from a PACA created trust, a plaintiff must demonstrate: (1) the commodities sold were perishable agricultural commodities under PACA; (2) the purchaser of the perishable agricultural commodities was a commission merchant, dealer or broker; (3) the transaction occurred in either interstate or foreign commerce; (4) the plaintiff has not received full payment on the transaction; and (5) the plaintiff preserved its trust rights. A&J Produce Corp. v. Chang, 385 F. Supp. 2d 354, 358 (S.D.N.Y. 2005). The majority of these elements are not contested at this time. There is no dispute over whether Healthy Harvest Berries' sales of strawberries qualify as sales of "perishable agricultural commodities" under PACA. See 7 U.S.C. § 499a(4)(A) (defining "perishable agricultural commodity" as "Fresh fruits . . . of every kind and character"). There is also no dispute as to whether Defendants are "dealers" engaged in interstate commerce. (See Doc. 10, TRO, at 4.) Nor do the parties dispute whether Healthy Harvest Berries preserved its trust rights.[2]

What the parties dispute is the amount owed to Healthy Harvest Berries. This dispute stems from the parties' disagreement over the nature of the agreement between Healthy Harvest Berries, Mr. Rodriguez, and Richgrove. According to Healthy Harvest Berries, it agreed to make *final sales* to Mr. Rodriguez and Richgrove at negotiated prices. Mr. Rodriguez and Richgrove, on the other hand, insist that the parties agreed to a *consignment* arrangement in which Defendants agreed to sell strawberries for Healthy Harvest Berries and to remit the proceeds of those sales back to Healthy Harvest Berries. In exchange, Dandrea was to receive a 10% commission, while Mr. Rodriguez and Richgrove were to earn a commission of $0.50 per box of strawberries.

The parties' positions are supported by competing declarations. For its part, Healthy Harvest Berries asserts that the idea of a consignment arrangement was *never* raised in the parties' discussions. (See Doc. 16, Decl. of Mr. Gonzalez, ¶ 4.) According to Healthy Harvest Berries, the parties agreed to *sales* of strawberries, which were made by Mr. Rodriguez as follows. Mr. Rodriguez would first text

---

[2] As will be discussed below, Mr. Rodriguez and Richgrove argue that the amount of any preliminary injunction should not exceed $93,755.40. If the Court disagrees with this position, Mr. Rodriguez and Richgrove request expedited discovery on whether Healthy Harvest Berries properly preserved its trust rights. (Doc. 14 at 4.)

or call-in purchase orders to Healthy Harvest Berries. (Id. ¶ 6.) Healthy Harvest Berries would then call Mr. Rodriguez to confirm the purchase order and to negotiate a price for the shipment. (Id. ¶ 11.) Finally, following delivery, Healthy Harvest Berries would send Mr. Rodriguez an invoice confirming the transaction and requesting full payment. (Id.) Healthy Harvest Berries has produced $516,038.90 worth of such invoices, which it maintains Mr. Rodriguez and Richgrove have not yet paid. (See Doc. 7 ¶ 9 & Ex. 2.)

Mr. Rodriguez, meanwhile, asserts that the parties' initial discussions in October 2012 plainly contemplated a consignment arrangement between Healthy Harvest Berries and Dandrea. (Doc. 14-1, Decl. of Mr. Rodriguez, at 1-2.) This is confirmed by Frank Dandrea, the only other person present at these discussions. (See Doc. 14-2, Decl. of Frank Dandrea, ¶ 4.) Mr. Rodriguez further asserts that in March 2013, he spoke with Humberto Gonzalez ("Mr. Gonzalez"), a senior sales manager for Healthy Harvest Berries. (Doc. 14-1 at 2.) Mr. Rodriguez maintains that during this conversation he reiterated that the parties' agreement entailed a consignment arrangement between Healthy Harvest Berries and Dandrea in which he and Richgrove would earn a certain commission for serving as the parties' point of contact. (Id.)

Mr. Rodriguez acknowledges that Healthy Harvest Berries sent him invoices for shipments of strawberries, but he disputes their significance. According to Mr. Rodriguez, Healthy Harvest Berries told him that the invoices were merely for "[its] records only." (Id. at 3.) Mr. Rodriguez stresses that the invoices were sometimes sent to him several weeks late, in sudden batches, or not at all. (Id.) He also maintains that he never made a payment to Healthy Harvest Berries based on an invoice. (Id.) A review of Mr. Rodriguez's schedule of payments to Healthy Harvest Berries seems to confirm this last point. (Cf. Doc. 14-1, Ex 1; Doc. 7-2.)

Finally, Mr. Rodriguez asserts that the parties' consignment arrangement lasted until late July or early August 2013, at which point the parties decided that Healthy Harvest Berries would just deal directly with Dandrea. (See Doc. 14-1 at 3-4.) Despite no longer being involved, Mr. Rodriguez and Richgrove concede that they still owe Healthy Harvest Berries $93,755.40. (Id. at 4.) Mr. Rodriguez explains that this amount represents the difference between (a) consignment proceeds that he received

///

5

1  while still acting as the parties' point of contact ($209,308.96); and (b) the commission that he is still
2  owed ($111,553.50). (Id. at 4-5.)
3        The parties' sharply conflicting version of the events are, for the most part, equally plausible.
4  There is, however, one detail that nudges the scales in favor of Healthy Harvest Berries. As Healthy
5  Harvest Berries points out, Mr. Rodriguez and Richgrove have not offered any documentary evidence
6  of the consignment agreement. This is particularly notable since, under PACA's regulations, the terms
7  and conditions of the consignment agreement should have been reduced to writing. See 7 C.F.R. §
8  46.30(b) (indicating that a consignee is considered a "grower's agent"); 7 C.F.R. § 46.32(a) (indicating
9  that the terms and conditions of a grower's agent's responsibilities should be set forth in writing). In
10 addition, a consignee owes several duties to the grower, including issuing receipts to the grower for all
11 produce received. See 7 C.F.R. § 46.32(b). Mr. Rodriguez and Richgrove, however, have not offered
12 anything that resembles consignment receipts. The only documentary evidence currently in the record
13 are the invoices that Healthy Harvest Berries sent to Mr. Rodriguez, and these appear to be legitimate
14 *sales* receipts.
15       Based on the evidence presented, the Court concludes that Healthy Harvest Berries has made a
16 sufficient showing regarding its likelihood of success on the merits. First, it is clear that Mr. Rodriguez
17 and Richgrove owe Healthy Harvest Berries at least $93,755.40. Even if, as Mr. Rodriguez argues, the
18 parties' agreement was one involving consignment, Mr. Rodriguez and Richgrove admit that they owe
19 Healthy Harvest Berries $93,755.40 in proceeds. Second, there are "serious questions" as to whether
20 Mr. Rodriguez and Richgrove owe Healthy Harvest Berries as much as $566,455.65. While success is
21 far from certain and will depend largely on credibility determinations, there is at least a "fair chance"
22 that Healthy Harvest Berries will be able to prove that its shipments of strawberries to Mr. Rodriguez
23 and Richgrove were final sales, not consignments. Marcos, 862 F.2d at 1362. If so, Healthy Harvest
24 Berries likely could recover $516,038.90 in unpaid invoices and $50,416.75 in interest and reasonable
25 attorney's fees. See Middle Mountain Land and Produce, Inc., v. Sound Commodities, Inc., 307 F.3d
26 1220, 1222-25 (9th Cir. 2002) (holding that contractual rights to interest and attorney's fees that are
27 "in connection with" produce transactions may be subsumed in a PACA trust claim); accord County
28 Best v. Christopher Ranch, LLC, 361 F.3d 629 (11th Cir. 2004).

### 2. Irreparable Harm

The dissipation of PACA trust assets constitutes irreparable harm if it makes ultimate recovery unlikely. Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132, 140-41 (3d Cir. 2000). There is sufficient evidence that such is the case here. Mr. Rodriguez initially responded to Healthy Harvest Berries' questions regarding the status of its missing payments by claiming that he was unsure where the money had gone. (Doc. 7 ¶ 24.) Mr. Rodriguez was then entirely unresponsive to Healthy Harvest Berries' subsequent attempts to contact him and resolve the issue. (Id. ¶ 26.) Mr. Rodriguez now acknowledges that he is "currently quite short of cash" and would need to obtain a family loan to pay Healthy Harvest Berries. (Doc. 14-1, Decl. of Mr. Rodriguez, at 5.) Taken together, this evidence sufficiently establishes trust dissipation and irreparable harm. See, e.g., Newland N. Am. Foods, Inc. v. H.P. Skolnick, Inc., No. 5:13-cv-0934 EJD, 2013 U.S. Dist. LEXIS 29048, at *7-8 (N.D. Cal. Mar. 4, 2013) (finding irreparable injury where the defendant was unresponsive to the plaintiff's demands for payment and requests for settlement, which indicated an inability to pay); Rey Rey Produce SFO, Inc. v. Mis Amigos Meat Market, Case No. C 08-1518 VRW, 2008 U.S. Dist. LEXIS 40607, at *5-6 (N.D. Cal. April 24, 2008) (finding irreparable injury where there the defendant bounced checks and made unfulfilled promises to pay).

### 3. Balance of the Equities

To determine the balance of the equities, a court must identify and weigh "the possible harm caused by the preliminary injunction against the possibility of harm caused by not issuing it." Univ. of Hawaii Professional Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999). The court must then decide whether, on balance, the equities favor the issuance of a preliminary injunction. Generally, the more likely it is that the party will succeed on the merits, the less the balance of the equities must tip in that party's favor to justify a preliminary injunction. See Los Angeles Mem. Coliseum Commission v. National Football League, 634 F.2d 1197, 1203-04 (9th Cir. 1980).

The possibility of harm to Healthy Harvest Berries in the absence of a preliminary injunction is significant: as indicated above, there is a substantial threat that the PACA trust is or will be dissipated, rendering full recovery unlikely for Healthy Harvest Berries. See Tanimura, 222 F.3d at 139 ("Once the PACA trust is dissipated, it is almost impossible for the beneficiary to obtain recovery.") (citation

omitted).  In contrast, since Mr. Rodriguez and Richgrove readily admit that they owe Healthy Harvest Berries $93,755.40 in produce-related transactions, no injury would be inflicted on Mr. Rodriguez and Richgrove's legitimate interests if the Court enjoins them from withdrawing, transferring, or otherwise removing $93,755.40 in PACA trust assets.  The balance of the equities therefore tips overwhelmingly in favor of a preliminary injunction preserving $93,755.40 in trust assets.

The more difficult question is whether a preliminary injunction should be imposed to preserve up to $566,455.65 in trust assets.  This is the amount that Healthy Harvest Berries maintains it is owed under the parties' sales agreements.  Since the Court has determined that there are "serious questions" on the merits of this issue, (see supra Section III.A.1), the balance of the equities must tip "sharply" in Healthy Harvest Berries' favor before the Court may grant this preliminary injunctive relief.  Alliance for The Wild Rockies, 632 F.3d at 1131.

Mr. Rodriguez and Richgrove do not offer any firm evidence or detailed explanation regarding the possible harm that they would suffer if a preliminary injunction is imposed.  Mr. Rodriguez simply states, in conclusory fashion, that the current temporary restraining order is "ruining his business and causing *him* irreparable harm."  (Doc. 14 at 3) (emphasis altered).  Nevertheless, it is not too difficult to envision the possibility of *some* harm if a preliminary injunction is imposed on Mr. Rodriguez and Richgrove.  A PACA trust is a non-segregated floating trust that permits commingling of all produce-related trust assets.  Endico Potatoes v. CIT Group/Factoring, 67 F.3d 1063, 1067 (2d Cir. 1995).  The single trust exists for the benefit of *all* the produce buyer's suppliers, and continues in existence until *all* the outstanding beneficiaries have been paid in full.  See Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.), 81 F.3d 280, 286 (2d Cir. 1996).  Thus, freezing PACA trust assets for the benefit of Healthy Harvest Berries impairs the ability of Mr. Rodriguez and Richgrove to satisfy the claims of other PACA-protected clients, especially since the amount requested to be frozen here, $566,455.65, is substantial.  This would harm the business.

With this in mind, the Court concludes that the balance of the hardships does not tip sharply in favor of issuing a preliminary injunction to preserve the full amount of $566,455.65.  Rather, the Court finds that the balance of the equities favors the protection of an additional $115,553.50 in trust assets, for a total of $209,308.90.  This amount ($115,553.50) represents the commission that Mr. Rodriguez

8

claims he earned. Healthy Harvest Berries has a greater likelihood of prevailing on the merits of this issue, as compared to the larger issue of whether the parties' transactions were final sales as opposed to consignments.

### 4. Public Interest

A preliminary injunction issued for the purpose of protecting PACA trust rights is in the public interest. See 7 U.S.C. § 499e(c)(1); see also Tanimura, 222 F.3d at 140 (recognizing that PACA trusts "explicitly encapsulate[]" the public interest).

### B. Expedited Discovery

As noted above, in the event the Court issues a preliminary injunction for an amount exceeding $93,755.40, Mr. Rodriguez and Richgrove request expedited discovery as to whether Healthy Harvest Berries properly preserved its trust rights. A court may permit expedited discovery upon a showing of good cause. See Fed. R. Civ. P. 26(d)(2); Semitool, Inc. v. Tokyo Electron America, Inc., 208 F.R.D. 273 (N.D. Cal. 2002). Good cause exists "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." Semitool, at 276. To make this determination, courts often consider factors such as (1) whether a preliminary injunction is pending; (2) the purpose of the discovery request; (3) the breadth of the discovery request; and (4) the burden on the non-moving parties. See American LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009).

The Court will permit expedited discovery, but will confine it to the issue of whether Healthy Harvest Berries failed to preserve its PACA trust rights by sending its invoices in an untimely fashion. This is a discrete matter, on which discovery should be easy to obtain. Moreover, resolving this issue in favor of Mr. Rodriguez and Richgrove likely would be fatal to the preliminary injunction. See, e.g., DiMare Homestead, Inc. v. Alphas of New York, Inc., Case No. 09 Civ. 6644 (PKC), 2012 U.S. Dist. LEXIS 48546, at *35-36 (S.D.N.Y. April 5, 2012). Finally, Healthy Harvest Berries does not oppose expedited discovery.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, the Court:

1. GRANTS Healthy Harvest Berries a preliminary injunction for $209,308.90.

2. GRANTS Mr. Rodriguez and Richgrove's request for expedited discovery on the issue of whether Healthy Harvest Berries failed to preserve its PACA trust rights by sending its invoices in an untimely fashion. This case shall otherwise proceed normally.

3. ORDERS Healthy Harvest Berries, Mr. Rodriguez, and Richgrove to file, by no later than **noon on March 13, 2014**, a joint proposed preliminary injunction order.

IT IS SO ORDERED.

Dated: **March 10, 2014**    /s/ Lawrence J. O'Neill
UNITED STATES DISTRICT JUDGE